## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 02 2020, 8:42 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa Manning
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Involuntary Termination of the Parent-Child Relationship of:

M.T. *(Minor Child),*

 and

J.M. *(Father),*

*Appellant-Respondent,*

v.

Indiana Department of Child Services,
*Appellee-Petitioner,*

October 2, 2020

Court of Appeals Case No.
20A-JT-737

Appeal from the Ripley Circuit Court

The Honorable Ryan J. King, Judge

Trial Court Cause No.
69C01-1910-JT-33

**Robb, Judge.**

# Case Summary and Issue

[1] J.M. ("Father") appeals the termination of his parental rights to his child and presents the sole issue of whether the juvenile court's termination of his parental rights was clearly erroneous. Concluding it was not clearly erroneous, we affirm.

# Facts and Procedural History

[2] M.T. ("Child") was delivered prematurely on October 11, 2018. Child's umbilical cord blood showed the presence of amphetamine, methamphetamine, and methadone. About a month after Child's birth, the Department of Child Services ("DCS") filed a child in need of services ("CHINS") petition because Child had drugs in his system at birth, Mi.T. ("Mother") tested positive for drugs, and Father was incarcerated since before Child's birth. Child remained in the hospital for the first month of his life and has never been in Mother's care.

[3] An initial hearing was held on November 13 and Father admitted that he was "incarcerated and is unable to care for [Child]" and that Child is a CHINS. Exhibit, Volume 4 at 231. Based on these admissions, the juvenile court adjudicated Child a CHINS. When Child was discharged from the hospital on November 16, he was released to his maternal great-grandmother. On December 3, the juvenile court issued a dispositional order requiring, in part, that Father contact DCS every week; keep all appointments with service

providers; not use, consume, or sell illegal substances; not consume alcohol; complete parenting and substance abuse assessments; submit to random drug screens; and attend all scheduled visitation with Child. Child was placed in foster care in January 2019.

[4] Father has been incarcerated for most of Child's life. Before Child's birth, Father was incarcerated when he was charged with, among other things, battering Mother while she was pregnant, a separate drug charge, being an habitual offender, and failure to appear. In December 2019, Father was convicted of the above charges and sentenced to prison for five and one-half years with an additional eight and one-half years to be served on probation. However, Father was given 592 days credit time for his pretrial incarceration and will only serve about two years and nine months of actual prison time. Father's expected release date is in mid-2021. *See* Transcript of Evidence, Volume 2 at 21.

[5] Father was free on bond for about four months, May 22 to September 6, 2019. During this time, Father was supposed to continue "Fatherhood Engagement[;] do random drug screens[; and] participate in supervised visits." *Id.* at 124. Father failed to maintain contact with DCS and did not regularly participate in visits, attending only four of ten offered supervised visits with Child. *See* Exhibit, Vol. 4 at 79. Father last saw Child on July 10, 2019, cutting off contact with DCS and missing the six remaining offered visits after learning that he had an outstanding arrest warrant. During the visits he attended, Father engaged minimally with Child, often passing Child off to his parents during the hour-

long visits. The court appointed special advocate ("CASA") did not believe that Father had established a "familiar bond" with Child. Tr., Vol. 2 at 196-97.

[6] While in jail, Father earned certificates for substance abuse, anger management, domestic violence, and fatherhood engagement courses. Family therapist Ron Bulthuis teaches fatherhood engagement courses for DCS and worked with Father during Father's incarceration. Bulthuis intended to continue offering Father services during the period Father was out on bond but "couldn't contact him" because Father failed to reach out to him. *Id.* at 56. During their sessions, Bulthuis felt Father was disengaged, stating that Father was "not really interested in discussing [the services], [] he just did them." *Id.* However, he awarded Father a certificate of completion. Bulthuis felt Father might have internalized the lessons but also testified that Father made little to no progress in services and did not know whether Father could apply what he learned. Father testified that he inquired about resuming visits with Child when he was re-incarcerated but never heard anything back. *See id.* at 247.

[7] DCS' initial plan was for reunification; however, due to Mother and Father's noncompliance with the dispositional order, the plan was changed to adoption in August of 2019. On October 2, 2019, DCS filed a petition to terminate Father's and Mother's parental rights. On January 21 and 28, 2020, the juvenile court held the termination hearing. Mother did not participate in the termination hearing and does not participate in this appeal. Father was incarcerated at the time of the termination hearing but was able to participate.

After hearing evidence, the juvenile court terminated the parental rights of Mother and Father. Father now appeals.

# Discussion and Decision

## I. Standard of Review

The Fourteenth Amendment to the United States Constitution protects the right of parents to establish a home and raise their children. *In re D.D.,* 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied.* The law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Although we acknowledge that the parent-child relationship is "one of the most valued relationships in our culture[,]" we also recognize that "parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cnty. Office of Family & Children,* 839 N.E.2d 143, 147 (Ind. 2005) (internal quotations omitted). The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children. *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. As such, termination is intended as a last resort, available only when all other reasonable efforts have failed. *Id*. The purpose of terminating parental rights is to protect children, not to punish parents. *In re D.D.*, 804 N.E.2d at 265.

[9] When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id*.

[10] The juvenile court entered findings of fact and conclusions thereon as required by Indiana Code section 31-35-2-8(c), and we therefore apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. We first determine whether the evidence supports the findings, then determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment. *Id*.

## II. Statutory Framework for Termination

[11] To terminate parental rights, Indiana Code section 31-35-2-4(b)(2) requires DCS to prove, in relevant part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the foregoing elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). If a juvenile court determines the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

## III. Remedy of Conditions

[12] We begin by noting that Father does not challenge any of the juvenile court's findings; therefore, we accept the findings as true. *McMaster v. McMaster,* 681 N.E.2d 744, 747 (Ind. Ct. App. 1997). Instead, Father challenges the juvenile court's conclusion that there is a reasonable probability that the conditions that

led to Child's removal and continued placement outside of Father's care will not be remedied.

[13] To determine whether such conditions will be remedied we engage in a two-step analysis: "First, we must ascertain what conditions led to [Child's] placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013) (quotation omitted). With respect to the second step, we judge the parent's fitness to care for the child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). In making these decisions the juvenile court must "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans denied*. Habitual conduct may include criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment, but the services offered to the parent and the parent's response to those services can also be evidence of whether conditions will be remedied. *A.D.S v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change." *In re I.A.*, 903 N.E.2d 146, 154 (Ind. Ct. App. 2009).

[14] Here, Child was initially removed from Father's care due to Father's incarceration and inability to care for him. We conclude there is sufficient

evidence to support the juvenile court's conclusion that a reasonable probability exists that these conditions will not be remedied.

[15] First, Father has been incarcerated most of Child's life and has an extensive criminal history, which is comprised of the following convictions:

> Obtaining a Controlled Substance by Fraud or Deceit, a Class D Felony, and Possession of Marijuana/hash oil/hashish, a Class A Misdemeanor, in 2014 with a probation violation; Possession of Schedule I, II, III, or IV Controlled Substance, a Class D Felony, in 2014 with a probation violation in 2015; Visiting a Common Nuisance, a Class B Misdemeanor, in 2015; possession of marijuana, a Class B Misdemeanor, in 2016 with a probation violation in 2017; Invasion of Privacy - violates protective order, a Class A Misdemeanor, in January, 2018 with a probation violation in April, 2018; Invasion of Privacy, a Level 6 Felony and Perjury, a Level 6 Felony, in May, 2019; and, the present offense Count I, Battery Resulting in Bodily Injury to a Pregnant Woman, a Level 5 Felony, Count II, Possession of Methamphetamine, a Level 6 Felony, Count VIII, Failure to Appear, a Level 6 Felony, and Habitual Offender Sentencing Enhancement.

Exhibit, Vol. 5 at 14.

[16] Next, during the four months of this case Father was not incarcerated, he failed to comply with services. Jessie Cutter, the DCS case manager assigned to Child's case, testified that Father did not participate in services while not incarcerated. *See* Tr., Vol. 2 at 124-25.  Specifically, Cutter stated that Father could not be located "eighty percent . . . of the time" he was not incarcerated. *Id.* at 130. During this time that Father could not be located he did not submit drug screens. *Id.* at 124-25. In the four months Father was not incarcerated, he

was offered ten visits with Child but chose to only attend four. Father's absence at supervised visits was a choice. He admits that he "avoided later visits after he discovered he had an outstanding arrest warrant." Brief of Appellant at 13.

[17] Lastly, although Father participated in fatherhood engagement classes while incarcerated, he put forth minimal effort toward the classes and failed to make any progress. Class instructor Bulthuis testified that Father never seemed fully engaged in the program and that Father failed to participate in discussions on a couple occasions. Tr., Vol. 2 at 56. Bulthuis explained that Father would "just kind of sit there, and give a very short answer yes, no." *Id.* at 56-57. Bulthuis opined that Father internalized the lessons but testified that he did not know whether Father would be able to apply what he had learned. *Id.* at 64. In addition, at the termination hearing, Father was unable to answer specific questions about the training he received while incarcerated, such as what the homework consisted of or what he had learned in the training. *See id.* at 239-40. Father even testified that he did not "know how to take care of a child." *Id.* at 242. While incarcerated, Father did not learn practical skills pertaining to raising Child, such as how to hold a child, yet only attended four out of ten supervised visits which would have afforded him the best opportunity to learn such skills.

[18] This court has held that a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services demonstrates the requisite reasonable probability that the conditions will not change. *Lang,* 861 N.E.2d at 372. Such is the case here. Father put forth

minimal effort while incarcerated, did not perform services required for reunification while not incarcerated, and his current incarceration "along with his high likelihood to reoffend demonstrate [his] inability to be able to care for [C]hild in the future." Appealed Order at 4; *see also In re A.W.,* 62 N.E.3d 1267, 1273 (Ind. Ct. App. 2016) (stating "the court may find that a parent's past behavior is the best predictor of [their] future behavior"). The juvenile court did not err when it concluded that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied.

# IV. Threat to Child's Well-being

[19] Father also challenges the juvenile court's conclusion that there is a reasonable probability that the parent-child relationship poses a threat to the well-being of Child. Having concluded the evidence is sufficient to show a reasonable probability the conditions resulting in Child's continued placement outside of Father's care will not be remedied, we are not required to consider whether the parent-child relationship poses a threat to Child's well-being. *See In re L.S.,* 717 N.E.2d at 209 ("The statute is written in the disjunctive; it requires the trial court to find only one of the . . . requirements of subsection (B) by clear and convincing evidence"). However, for the sake of completeness, we will address it briefly.

[20] Father contends this conclusion is erroneous because the undisputed record shows that Father was making efforts and he has "completed prison programs that will aid him in parenting upon his release." Reply Brief of Appellant at 6.

We conclude the juvenile court's findings support its conclusion that the parent-child relationship with Father poses a threat to Child's well-being.

[21] In determining whether the continuation of a parent-child relationship poses a threat to a child, the juvenile court should consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *In re A.P.,* 981 N.E.2d 75, 81 (Ind. Ct. App. 2012). The juvenile court should also judge a parent's fitness to care for a child as of the time of termination proceedings, taking into consideration evidence of changed conditions. *Id.* When the evidence shows that the child's emotional and physical development is threatened, termination of the parent-child relationship is appropriate. *In re L.S.*, 717 N.E.2d at 210-11.

[22] Here, the evidence in the record reveals that Father lacks a "familiar bond" with Child, Tr., Vol. 2 at 196; has been incarcerated for all but four months of Child's life; and, while not incarcerated, failed to take advantage of numerous opportunities to establish a bond with Child through supervised visits. In the four months Father was not incarcerated, he was offered ten visits with Child but chose to only attend four. During these visits Father engaged minimally with Child, as Cutter testified that Father "handed [Child] off to his parents the majority of the time." *Id.* at 133. And Father "never changed a diaper" and "only fed [Child] once." *Id.*

[23] Father will be incarcerated until mid-2021 and presented no evidence that he had plans for suitable housing or employment after his release. *See id.* at 237-38.

And "[a] parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that" parental rights may be terminated. *In re A.K.*, 924 N.E.2d 212, 221(Ind. Ct. App. 2010) (quoting *Castro v. State Office of Family and Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006)). While in jail, Father earned certifications of completion for substance abuse, anger management, domestic violence and fatherhood engagement courses. However, Bulthuis testified that he "ha[d] no idea" if Father would be able to apply any lessons learned from the fatherhood engagement course because he showed little to no progress. Tr., Vol. 2 at 64. In his testimony, Father even agreed that he did not "know how to take care of a child." *Id.* at 242.

[24] The evidence in the record and the juvenile court's findings sufficiently support the conclusion that the continuation of the parent-child relationship poses a threat to Child's well-being.

# Conclusion

[25] We conclude that the juvenile court's findings support its judgment terminating Father's parental rights. Therefore, the juvenile court's order is not clearly erroneous. Accordingly, we affirm.

[26] Affirmed.

Crone, J., and Brown, J., concur.